# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

LARRY BETHEL,                              :
                                          :
    *Plaintiff,*                      :
                                          :
    v.                                :    Civil Action No.:    20-1940 (RC)
                                          :
JOSE RODRIGUEZ, *et al*,                   :    Re Document No.:    60, 62
                                          :
    *Defendants.*                     :

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

## I.  INTRODUCTION

Plaintiff Larry Bethel ("Plaintiff" or "Mr. Bethel") bought an air conditioner at a Home Depot, U.S.A., Inc. ("Home Depot") store, but a store employee, Nelson Benton ("Mr. Benton"), incorrectly believed he stole the air conditioner and reported a theft to Officer Jose Rodriguez ("Officer Rodriguez").  After this report, Officer Rodriguez obtained an arrest warrant for Mr. Bethel, and although Mr. Bethel was ultimately not arrested, he endured psychological distress in anticipation of a possible arrest.  Now, Mr. Bethel raises claims for false arrest, punitive damages, and defamation against Mr. Benton, and a claim for defamation against Home Depot. *See* 2d Am. Compl. ¶¶ 87–91, 125–27, 176–80, 186–190, ECF No. 11-2.  Mr. Bethel also asserts several constitutional and common law tort claims against Officer Rodriguez and the District of Columbia (together, the "District Defendants"), comprising false arrest, malicious prosecution, negligence, and defamation.  *See id.* ¶¶ 58–69, 82–86, 98–112, 125–27, 128–136, 145–153, 171–75, 181–85.  Home Depot and Mr. Benton have filed a motion for summary judgment, and so

have Officer Rodriguez and the District of Columbia.  For the reasons stated below, the motions are each granted in part and denied in part.

## II.  BACKGROUND

### 1.  Facts[1]

Mr. Bethel is a maintenance worker at MedStar National Rehabilitation Hospital.  *See* District Defendants' Statement of Material Facts ("Dist. Defs. SOMF") ¶ 1; *see also* Pl.'s Dep. Transcript ("Pl. Dep. Tr.") at 12:6–12, Dist. Defs. Mem. Supp. Mot. Summ. J. ("Dist. Defs. Mem.") Ex. 1, ECF No. 62-2.  His shift is from 12:00 a.m. to 8:30 a.m.  Dist. Defs. SOMF ¶ 1. Mr. Bethel has never been arrested.  Pl. Dep. Tr. at 63:11–14.

On July 19, 2019, after finishing work, Mr. Bethel went to Home Depot at approximately 9:30 a.m.  Dist. Defs. SOMF ¶ 2; Pl. Dep. Tr. 14:15.  Mr. Bethel sought to buy an air conditioner because of recent hot weather.  Dist. Defs. SOMF ¶ 2; Pl. Dep. Tr. at 14:6–16.  He found an air conditioner he liked and purchased it.  Dist. Defs. SOMF ¶ 2; Pl. Dep. Tr. at 14:6–15:13. According to Mr. Bethel, while he was still at the cashier station, he noticed the box was damaged, and the cashier told him to exchange it for another one.  Pl. Dep. Tr. at 15:2–15:13. Mr. Bethel went back and found a replacement air conditioner.  *See id.* at 15:9–15:13, 30:20– 31:7.  Mr. Bethel testified that he placed this new air conditioner in his cart and returned to the

---

[1] Mr. Bethel has not offered a separate statement of disputed material facts, instead including a section of disputed facts in his opposition filing.  Mr. Bethel has therefore "failed to adhere to the local rule that requires a non-movant facing a summary-judgment motion to append 'a separate concise statement of genuine issues' of material fact, with record references and citations."  *Kyle v. Bedlion*, 177 F. Supp. 3d 380, 385 n.1 (D.D.C. 2016) (Jackson, K.B., J.) (quoting LCvR 7(h)(1)).  However, while Mr. Bethel's opposition is meandering and often recounts facts that are irrelevant to the specific fact that is purportedly being disputed, the Court is able to identify his legitimate factual disputes and will "decline to find that [Mr. Bethel] has conceded facts that appear to be plainly disputed in light of the record and the colloquy between the parties."  *Id.*

cashier to show the unit, and the cashier told Mr. Bethel he was "good."  *Id.* at 111:2–16, 112:17–113:11.  Mr. Bethel then left Home Depot.  *Id.* at 14:6–15:13.

Mr. Benton, a member of Home Depot's asset protection staff, was at work that day.  *See* Home Depot and Benton Mem. Supp. Mot. Summ. J. & Mot. Dismiss ("Home Depot & Benton Mem.") ¶ 2; ECF No. 60-1[2]; *see also* Benton Dep. Transcript ("Benton Dep. Tr.") at 27:12–15, Dist. Defs. Mem. Ex. 2, ECF No. 62-3.  Mr. Benton's recounting of events significantly differs from Mr. Bethel's.  According to Mr. Benton, he was watching Mr. Bethel from the sales floor, and he saw him place an air conditioner in his shopping cart and leave the store without going to the cashier.  *Id.* at 29:7–19; 31:18–32:7, 59:18–60:2.  Again, Mr. Bethel's testimony is that he returned to the cashier after selecting an undamaged unit.  *See* Pl. Dep. Tr. at 30:20–31:7.  Mr. Benton followed Mr. Bethel as he left the store and saw him put the air conditioner in a car.  Benton Dep. Tr. at 32:13–18; 41:8–15.  Mr. Benton recorded the license plate number of the car.  *Id.* 32:13–18.  Mr. Benton did not approach or speak to Mr. Bethel at any point.  *Id.* at 106:22–109:3.  Mr. Benton then returned inside Home Depot and analyzed a video clip of Mr. Bethel inside the store, which Mr. Benton testified showed that Mr. Bethel took an air conditioner and left the store without paying for it.[3]  *Id.* at 31:1–6; 32:13–18; 51:20–52:2; 101:4–15.  Mr. Benton testified that he did not speak to any cashiers about the possible theft, and that his practice is to not conduct such interviews, because it is a "conflict."  *Id.* at 112:19–113:10; *see also id. at*

---

[2] Home Depot and Mr. Benton also did not file a separate statement of undisputed material facts, but they include a functionally identical section in their memorandum supporting their motion for summary judgment.  When the Court uses the paragraph symbol, ¶, in citing to this memorandum, it is referring to the numbered paragraphs starting on the fourth page of the memorandum.  In addition, because the memorandum is not paginated, the Court uses the page numbering as listed by ECF.

[3] Unfortunately, the video is not part of the factual record, and Mr. Benton testified that he did not know where the video is today.  Benton Dep. Tr. 32:19–22.

60:10–11 ("We do not speak to store associates about any cases or thefts or customers of that nature.").

Based on the video clip and his first-hand observation, Mr. Benton said that he concluded that Mr. Bethel stole the air conditioner, and he wrote an incident report. *Id.* at 32:13–18, 45:1–9; 46:9–12; 47:6–14. He informed Officer Jose Rodriguez, a member of the Metropolitan Police Department ("MPD"), and shared the incident report and video clip with him.[4] *Id.* at 43:21–44:1, 45:1–9; 50:14–19; 51:20–52:2; 53:6–11; *see also* Rodriguez Dep. Transcript ("Rodriguez Dep. Tr.") at 104:13–105:16, Dist. Defs. Mem. Ex. 3, ECF No. 63-1. According to Officer Rodriguez, he reviewed the incident report and video clip, and believed that the video corroborated Mr. Benton's version of events. Rodriguez Dep. Tr. at 71:7–73:12; 105:14–16, 105:17–106:1. Officer Rodriguez also testified that at this point he determined there was probable cause to seek an arrest warrant. *Id.* at 105:17–106:1.

The following day, July 20, 2019, Officer Rodriguez completed a police report that repeated the information he received from Mr. Benton; the report mentioned that the event was captured on video. *See* Rodriguez Police Rep., Dist. Defs. Mem. Ex. 4, ECF No. 62-4. On August 16, 2019, Rodriguez's Affidavit in Support of an Arrest Warrant was approved by the Assistant United States Attorney assigned to the case. Rodriguez Aff. in Supp. of an Arrest Warrant ("Rodriguez Aff."), Dist. Defs. Mem. Ex. 5, ECF No. 62-5; Dist. Defs. SOMF ¶ 19.

---

[4] Officer Rodriguez also worked as a part-time contractor for Home Depot to "keep customers safe" and prevent theft. Rodriguez Dep. Tr. at 50:5–17, 51:18–52:2. When working at Home Depot, he was still on duty as a sworn MPD officer. *Id.* at 50:18–21. Officer Rodriguez and Mr. Benton knew each other through their work at Home Depot. *See id.* at 50:5–7; Benton Dep. Tr. 26:18–27:1. Officer Rodriguez was not a subordinate to Mr. Benton and did not report to him. Benton Dep. Tr. 102:7–9. Neither Officer Rodriguez nor Mr. Benton could recall if Officer Rodriguez was working at Home Depot on July 19, 2019. *See id.* at 27:17–20; Rodriguez Dep. Tr. 61:6–8.

The affidavit recounts Mr. Benton's description of events but does not mention that a video clip exists or that Officer Rodriguez watched it. *See* Rodriguez Aff.; *see also* Rodriguez Dep. Tr. 71:10–73:15. Also on August 16, 2019, Officer Rodriguez swore out a complaint against Mr. Bethel for second degree theft, in violation of D.C. Code 22, §§ 3211, 3212(b). *See* Rodriguez Compl. and Arrest Warrant, Dist. Defs. Mem. Ex. 6, ECF No. 62-6.; Dist. Defs. SOMF ¶ 19. A warrant for the arrest of Mr. Bethel was issued August 16, 2019. Dist. Defs. SOMF ¶ 20. The address listed in the criminal complaint was "3047 Vista Place, NE, DC." *Id.* ¶ 20.

Mr. Bethel did not live at that address at the time, which was the home of his father-in-law, Mr. Spann. *See generally* Body-Worn Camera Video ("BWC Video") at 4:04–4:29, Dist. Defs. Mem. Ex. 7, ECF No. 62-7. On August 20, 2019, the Warrant Squad went to the address to execute the arrest warrant. Dist. Defs. SOMF ¶ 21. Mr. Bethel was not at the house; Mr. Spann answered the door. *Id.* ¶¶ 21–22; *see* BWC Video at 4:05. Mr. Spann said that Mr. Bethel received mail at the house and would sometimes come by to pick it up. *See* BWC Video at 4:55–5:09. Officer Harmon, a member of the warrant team, gave Mr. Spann a business card with his name and phone number on it, and asked Mr. Spann to give the card to Mr. Bethel if he saw him. *See id.* at 5:53–5:56, 6:32–6:36; Dist. Defs. SOMF ¶ 23. Officer Harmon told Mr. Spann that Mr. Bethel "has a court matter that he needs to take care of" but it was "nothing serious." *See* BWC Video at 6:12–6:20; Dist. Defs. SOMF ¶ 24. Officer Harmon did not tell Mr. Spann that Mr. Bethel was suspected of stealing an air conditioner or tell him about the arrest warrant. *See generally* BWC Video; SOMF ¶¶ 25–26.

Mr. Bethel first found out that the police were looking for him when he received a call

from his wife on or about August 20, 2019.[5]  *See* Pl. Dep. Tr. 17:4–22.  Mr. Bethel's testimony

diverges from the police body cam footage of the warrant squad's interaction with Mr. Spann.

Mr. Bethel testified that his wife told him that the police had been to her father's house to arrest

him "because they said I had stolen something."  *Id.* at 17:15–22.  Mr. Bethel also testified that

he contacted Mr. Spann, who confirmed that the police "had a warrant for [his] arrest" and

provided Officer Harmon's contact information.  *Id.* at 20:1-12, 21:14–20.  As previously noted,

the body cam footage plainly shows that the police did not tell Mr. Spann that Mr. Bethel was

suspected of theft or that there was an arrest warrant for Mr. Bethel.  *See generally* BWC Video.

Nevertheless, it is possible that Mr. Spann assumed—correctly—that the police came because

there was an arrest warrant for Mr. Bethel.

On the evening of August 20, 2019, Mr. Bethel spoke to Officer Harmon, who informed

him about the warrant and suggested that he turn himself in.  Dist. Defs. SOMF ¶ 31; *see* Pl.

Dep. Tr. at 22:17–23:1.  Mr. Bethel went to the police station by himself at around 2:00 a.m. to

5:00 a.m. on the morning of August 21, 2019.  Pl. Dep. Tr. at 23:2–12, 95:10–12.  He went to the

police station to "turn [himself] in" based on the arrest warrant.  *Id.* at 215:19–216:7.  He was

nervous and thought he was about to be "locked up" in jail.  *Id.* at 213:20–214:2.  Several police

officers were present at the station, although Mr. Bethel only spoke to one officer.  *Id.* at 25:7–

18.  After Mr. Bethel told the officer that he was there to "turn himself in," the officer searched

for a warrant for Mr. Bethel.  *Id.* at 121:11–122:5.  During this search, Mr. Bethel was at the

police station for around "30 to 45 minutes, to an hour."  *Id.* at 126:16–127:1.  Eventually, Mr.

---

[5] The record is unclear as to whether Mr. Bethel and his wife were, or currently are, separated, but it is not factually relevant.

Bethel was told there was no active warrant for his arrest. *Id.* at 124:6–21. Until he was told that there was no warrant for his arrest, Mr. Bethel felt that he was unable to leave the station if he wanted to.[6] *Id.* at 216:9–217:13. He was not arrested, placed in handcuffs, or taken to the back area of the police station. *Id.* at 128:8–13, 125:8–12. Because the police could not locate a warrant, Mr. Bethel was told he was free to go, and he left and went home. *Id.* at 128:14–20; Dist. Defs. SOMF ¶ 37.

By chance, also on August 20, 2019, Mr. Benton was searching through footage for another case and located a second video that showed Mr. Bethel paying for an air conditioner. Rodriguez Dep. Tr. at 98:8–16; Benton Dep. Tr. at 53:6–11, 54:2–17. Mr. Benton testified that he could not determine whether the air conditioner that Mr. Bethel left the store with was the same type of unit, or the same price, as the one he purchased.[7] Benton Dep. Tr. at 55:19–56:17, 82:15–83:4. Regardless, after uncovering the second video, Mr. Benton sought to have the warrant recalled. *Id.* at 56:8–17. Although this second video existed when Mr. Benton made his original report, he did not see or know of the video at the time. *Id.* at 53:12–16, 55:3–5. Once Mr. Benton saw this new video showing that Mr. Bethel had paid for an air conditioner, he "immediately" called Officer Rodriguez to tell him about the second video and have the warrant withdrawn. *Id.* at 54:2–15, 56:5–17, 89:9–90:8. Mr. Rodriguez was not working that day but nonetheless went to court, spoke with the prosecutor, and asked that the warrant be withdrawn.

---

[6] Mr. Bethel also testified that an officer told him his name would be placed in a detention journal or that he would be put in a holding cell, "something of that nature." Pl. Dep. Tr. at 61:9–14. Mr. Benton and Home Depot introduce a purported detention journal covering that night that does not contain Mr. Bethel's name. *See* Detention Journal, Home Depot Ex. O, ECF No. 60-12.

[7] Mr. Bethel testified that it was the same type of unit and nothing in the record contradicts him on this point. Pl. Dep. Tr. 111:2–16, 112:17–113:11. Mr. Rodriguez agreed that it was "fair to say that Mr. Bethel didn't steal an air-conditioner[.]" Rodriguez Dep. Tr. 98:7–19.

Rodriguez Dep. Tr. at 98:2–16, 100:12–101:2.  The warrant was "nolle dismissed [and] withdrawn" on August 20, 2019.  *See* Rodriguez Compl. and Arrest Warrant.  Thus, by the time Mr. Bethel reported to the police station in the early morning of August 21, 2019, there was no active warrant for his arrest.

The record contains no discussion of any further events relating to the air conditioner incident.  Mr. Bethel has never directly interacted, at any point in time, with Mr. Benton or Officer Rodriguez.  *See* Benton Dep. Tr. at 106:22–108:4; Pl. Dep. Tr. at 37:11–20, 63:1–4, 187:13–22.  Still, Mr. Bethel alleges he suffered psychological distress because of the incident, describing himself as a "nervous wreck" who has been "[n]ot sleeping well and not eating well" ever since going to the police station.  Pl. Dep. Tr. at 129:9–15.  He sought treatment to alleviate this distress and was diagnosed with post-traumatic stress disorder.  *See id.* at 65:17–67:21.

## 2.  Procedural History

Mr. Bethel filed this action on July 17, 2020, asserting common law tort and 42 U.S.C. § 1983 claims against the MPD, Officer Rodriguez, Home Depot, and Mr. Benton.  On April 6, 2021, the Court substituted the District for the MPD as a defendant, partially granted the District's motion to dismiss for failure to state a claim, and granted Mr. Bethel's motion to amend his complaint.[8]  *Bethel v. Rodriguez,* No. 20-cv-1940, 2021 WL 1340961, at *7, 9 (D.D.C. Apr. 9, 2021).  The District, Home Depot, and Mr. Benton filed answers.  *See* Dist. Answer to 2d Am. Compl, ECF No. 19; Home Depot Answer to 2d Am. Compl, ECF No. 20; Benton Answer to 2d Am. Compl., ECF No. 27.  Mr. Benton also filed a partial motion to

---

[8] The MPD is a subordinate agency of the District and an improper party defendant. *Bethel*, 2021 WL 1340961 at *3; *see also Turner v. District of Columbi*a, No. 14-cv-424, 2014 WL 1189879, at *1 (D.D.C. Feb. 27, 2014) (substituting the District of Columbia as defendant in place of MPD).

dismiss several counts for failure to state a claim, while Officer Rodriguez sought to dismiss in full for failure to state a claim. *See* Benton Mot. Dismiss, ECF No. 26; Rodriguez Mot. Dismiss, ECF No. 38.

On March 31, 2022, the Court granted Mr. Benton's partial motion to dismiss, and granted in part and denied in part Officer Rodriguez's motion. *Bethel v. Rodriguez*, No. 20-cv-1940, 2022 WL 971066, at *9 (D.D.C. Mar. 31, 2022). After that second memorandum opinion, a significant number of claims still remained  These claims are, as asserted against the District Defendants: a seizure without probable cause in violation of the Fourth Amendment under 42 U.S.C. § 1983 (Count One); malicious prosecution in violation of the Fourth Amendment under 42 U.S.C. § 1983 (Count Two); common-law false arrest and false imprisonment (Count Five and Count Thirteen); assault (Count Eight); negligence (Count Nine and Count Fifteen); punitive damages (Count Twelve); and defamation per se (Count Eighteen and Count Nineteen).[9] *See* 2d. Am. Compl.  ¶¶ 58–69, 82–86, 98–112, 125–136, 145–153, 171–75, 181–85.  Against Mr. Benton, the claims continuing are common-law false arrest (Count Six); punitive damages (Count Twelve); and defamation per se (Count Twenty). *See id.* ¶¶ 87–91, 125–27, 176–80.

---

[9] Mr. Bethel's false arrest and negligence claims against the District of Columbia are based on respondeat superior liability for the actions of Officer Rodriguez. *See* 2d. Am. Compl. ¶¶ 135, 152; *Simmons v. Skelonc*, No. 20-cv-2845, 2021 WL 3207042, at *7 (D.D.C. July 29, 2021) (specifying that respondeat superior is a "legal theory of vicarious liability that transfers liability from an agent to its principals").  As far as the Court can tell, the defamation per se claim is also based on respondeat superior liability, although this connection is not expressly stated. *See* Am. Compl. ¶ 181–85.  The Court can thus analyze the claims against Officer Rodriguez and the District of Columbia together. *See, e.g., Black v. District of Columbia*, 480 F. Supp. 2d 136, 141 (D.D.C. 2007) (finding no basis for respondeat superior vicarious liability where predicate claims against employees failed).

One claim, defamation per se (Count Twenty-One), remains against Home Depot.[10]  *Id.* ¶¶ 186–
190.

Now, Home Depot and Mr. Benton move for summary judgment.  *See* Home Depot &
Benton Mem.  So do the District Defendants.  *See* Dist. Defs. Mem.  Mr. Bethel has filed
oppositions to both motions.  *See* Pl. Mem. Opp. Home Depot & Benton Mot. Dismiss & Mot.
Summ. J. ("Pl. Home Depot & Benton Opp."), ECF No. 64; Pl. Mem. Opp. Dist. Defs. Mot.
Summ. J. ("Pl. Dist. Defs. Opp."), ECF No. 65.

Before moving on, the Court confronts a procedural mishap.  Home Depot and Mr.
Benton, in the same filing as their motion for summary judgment, also move to dismiss two of
the counts (Count Twelve and Count Twenty-One) under Rule 12(b)(6) for failure to state a
claim.  *See* Home Depot & Benton Mem. at 11–12, 21–23.  A Rule 12(b)(6) motion is "a method
of testing the sufficiency of the statement of the claim for relief; as such, it is filed *before* any
responsive pleading."  *Murphy v. Dep't of Air Force*, 326 F.R.D. 47, 48 (D.D.C. 2018)
(emphasis in original) (internal citation omitted).  Because Home Depot and Mr. Benton have
already answered the operative complaint, *see* Home Depot Answer to 2d Am. Compl; Benton
Answer to 2d Am. Compl., a motion to dismiss for failure to state a claim is procedurally
improper.

"The decision to convert a motion to dismiss into a motion for summary judgment is
committed to the sound discretion of the trial court."  *Ryan-White v. Blank*, 922 F. Supp. 2d 19,
22 (D.D.C. 2013) (citation omitted).  "In exercising this discretion, the 'reviewing court must
assure itself that summary judgment treatment would be fair to both parties.'"  *Bowe-Connor v.*

---

[10] The remaining Home Depot claim is also based on respondeat superior liability.  *See*
2d Am. Compl. ¶ 15 (alleging that Mr. Benton was acting in the scope of employment when he
made alleged defamatory statements).

*Shinseki*, 845 F. Supp. 2d 77, 85–86 (D.D.C. 2012) (quoting *Tele–Commc'ns of Key W., Inc. v. United States*, 757 F.2d 1330, 1334 (D.C. Cir. 1985)).  There is no sign of unfairness here. Home Depot and Mr. Benton's motion to dismiss is made together with their motion for summary judgment, giving ample notice that the Court will be looking to the factual record as it resolves these filings.  Indeed, Home Depot and Mr. Benton are at times ambiguous as to whether they seek dismissal or summary judgment.  *See* Home Depot & Benton Mem. at 22–23 (arguing both that "dismissal is proper" and that "summary judgment . . . is proper" for Count Twelve).  Mr. Bethel has had an opportunity to review Home Depot and Mr. Benton's arguments; his opposition contains no answer as to why these two counts should go forward, whether under a motion to dismiss or summary judgment standard.  And as will be discussed later when resolving Home Depot and Mr. Benton's arguments, the substance of the two challenged claims also leaves no concern that shifting the procedural posture would alter the Court's decision.  Accordingly, the Court proceeds fully at the summary judgment stage.

## III.  LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, a court must grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   And a dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the non-movant.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).  The inquiry under Rule 56 is guided by "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251–52.

One of the principal purposes of summary judgment is to determine whether there is a genuine need for trial by disposing of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324. "[T]he non-movant 'may not rest upon mere allegation or denials . . .' but must [instead] present 'affirmative evidence' showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (quoting *Anderson*, 477 U.S. at 256). In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence." *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). Inferences must be analyzed in the light most favorable to the non-movant. *See Anderson*, 477 U.S. at 255. But conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). "[I]n a case where the court has the benefit of video evidence, the Supreme Court has stated that courts deciding summary judgment motions should 'view[] the facts in the light depicted by the videotape[.]'" *Armbruster v. Frost*, 962 F. Supp. 2d 105, 110 (D.D.C. 2013) (quoting *Scott*, 550 U.S. at 381). Lastly, "[e]ven where a summary judgment motion is unopposed, it is only properly granted when the movant has met its burden." *Cromartie v. District of Columbia*, 479 F. App'x 355, 356 (D.C. Cir. 2012) (quoting *Alexander v. FBI*, 691 F. Supp. 2d 182, 193 (D.D.C. 2010)).

## IV.  ANALYSIS

At the outset, the Court comments that Mr. Bethel's opposition filings are not particularly responsive to either motion for summary judgment.  The oppositions frequently "dispute" material facts by reciting other unrelated facts, and they altogether fail to address several of the legal arguments made by the Defendants.  Nonetheless, the Defendants must still meet their burden of showing they are entitled to the relief they seek.  The Court thus considers Mr. Bethel's various counts in turn.  Ultimately, the Court's conclusions are mixed, granting summary judgment on some claims but allowing the majority of the challenged claims to proceed.

### A.  Mr. Bethel's False Arrest Claims Involve a Disputed Material Issue of Fact

Under District of Columbia law, to establish a claim for false arrest, a plaintiff must show: "(1) detention or restraint against one's will within boundaries fixed by the defendant, and (2) the unlawfulness of such restraint."[11]  *Harris v. U.S. Dep't of Veterans Affs.*, 776 F.3d 907, 911–12 (D.C. Cir. 2015).  Put another way, the core of a false arrest claim is "[t]he unlawful detention of a person without a warrant for any length of time whereby he is deprived of his personal liberty or freedom of locomotion . . . by actual force, or by fear of force, or even by words."  *Weishapl v. Sowers*, 771 A.2d 1014, 1020 (D.C. 2001) (citation omitted).  "Rather than depending upon the subjective state of mind of the plaintiff, whether particular conduct amounts to false imprisonment depends upon the actions and words of the defendant, which must provide a basis for a reasonable apprehension of present confinement."  *Id.*  An arrest may occur "where a person is taken into custody or restrained of his full liberty, or where the detention of a person

---

[11] In the District of Columbia, "'[f]alse arrest' is indistinguishable as a practical matter from the common law tort of 'false imprisonment.'" *Enders v. District of Columbia*, 4 A.3d 457, 461 (D.C. 2010).

in custody is continued for even a short period of time." *Coleman v. United States*, 295 F.2d 555, 563–64 (D.C. Cir. 1961) (quoting *Long v. Ansell,* 69 F.2d 386, 389 (D.C. Cir. 1934)) Additionally, "[l]iability is incurred for the procuring of a false arrest and imprisonment if by acts or words, one directs, requests, invites or encourages the unlawful detention of another." *Smith v. District of Columbia*, 399 A.2d 213, 218 (D.C. 1979).

Liability for false arrest under § 1983 derives from the Fourth Amendment's prohibition on unreasonable searches and seizures. *See District of Columbia v. Wesby*, 583 U.S. 48, 56–57 (2018). In the District of Columbia, "the elements of a constitutional claim for false arrest are substantially identical to the elements of a common-law false arrest claim." *Johnson v. District of Columbia.*, 490 F. Supp. 3d 144, 166 (D.D.C. 2020) (quoting *Reiver v. District of Columbia*, 925 F. Supp. 2d 1, 7 (D.D.C. 2013)); *see also Amobi v. District of Columbia Dep't of Corr.,* 755 F.3d 980, 989 (D.C. Cir. 2014) ("Constitutional and common law claims of false arrest are generally analyzed as though they comprise a single cause of action."). An arrest is a seizure under the Fourth Amendment. *See Torres v. Madrid*, 141 S. Ct. 989, 996 (2021). Moreover, a "'seizure' of a 'person' . . . can take the form of 'physical force' or a 'show of authority' that 'in some way restrain[s] the liberty' of the person." *Id.* (quoting *Terry* v. *Ohio*, 392 U.S. 1, 19 n. 16 (1968)). In total, "[t]he crucial test in deciding whether a person has been seized is whether, 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.'" *T.W. v. United States*, 292 A.3d 790, 795 (D.C. 2023) (quoting *I.N.S. v. Delgado,* 466 U.S. 210, 215 (1984)).

After a prima facie case of false arrest has been established, "a showing of probable cause constitutes a valid defense [to such] an action."[12] *Shaw v. May Department Stores Co.*, 268 A.2d 607, 609 (D.C. 1970)*; see also Bradshaw v. District of Columbia*, 43 A.3d 318, 323 (D.C. 2012) ("A police officer may justify an arrest [and defeat both a § 1983 and a common-law false arrest claim] by showing that he or she had probable cause, in the constitutional sense, to make the arrest."). Specifically, "[p]robable cause to arrest 'exists where the facts and circumstances within the police officers' knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a man or woman of reasonable caution in the belief that an offense has been or is being committed.'" *Butler v. United States*, 102 A.3d 736, 739 (D.C. 2014) (quoting *Spinner v. United States*, 618 A.2d 176, 178 (D.C. 1992)). "Probable cause is not a high bar." *Johnson*, 490 F. Supp. 3d at 156 (quoting *Wesby*, 583 U.S. at 57). In cases "where the facts are undisputed or clearly established . . . probable cause becomes a question of law for the court" but it is otherwise an issue for the finder of fact. *Jenkins v. District of Columbia*., 223 A.3d 884, 891 (D.C. 2020) (citation omitted).

### 1. Mr. Benton

There is no evidence that Mr. Bethel was ever personally detained or arrested by Mr. Benton. Mr. Bethel was not stopped at the Home Depot and never felt as if he was not free to leave the store. *See* Pl. Dep. Tr. at 113:22–114:2, 173:22–174:5. Mr. Bethel and Mr. Benton

---

[12] Officer Rodriguez does not invoke the doctrine of qualified immunity to defend himself against the 42 U.S.C. § 1983 charge in Count One. "Qualified immunity shields federal and state officials from money damages [under § 1983] unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Officer Rodriguez instead bases his defense on the assertion that any arrest of Mr. Bethel was supported by probable cause. *See, e.g.*, Dist. Defs. Mem. at 11–13.

never interacted on July 19, 2019 or on "any occasion."  Benton Dep. Tr. at 106:22–108:4; Pl. Dep. Tr. at 37:11–20.

The argument that Mr. Benton is responsible for false arrest relies on a causal link between his report to Officer Rodriguez and the events that eventually led Mr. Bethel to the police station.  Such a theory of liability is generally foreclosed by D.C. law: "[d]amages for false arrest cannot be predicated upon the fact that one party has told the police that another has committed an offense of a criminal nature, where the decision to arrest remains with the police."[13]  *Curry v. Giant Food Co. of the District of Columbia*, 522 A.2d 1283, 1291 (D.C. 1987); *see also Amobi,* 755 F.3d at 990–91 (same).

Crucially, though, this immunity does not apply "where an accuser acted with malice by providing the police with information he knew to be false."  *Curry*, 522 A.2d at 1291.  An accuser "who knowingly gives false information to a police officer necessarily interferes with the intelligent exercise of the officer's independent judgment and discretion and thereby becomes liable for a false arrest that later occurs."  *Amobi*, 755 F.3d at 991 (quoting *Vessels v. District of Columbia*, 531 A.2d 1016, 1020 (D.C. 1987)).  Accordingly, "[a] complainant is required to disclose . . . material facts; that is, facts material to the alleged crime charged" to a police officer when reporting a crime.  *Id.* (quoting *Sears Roebuck & Co. v. Gault,* 175 A.2d 795, 797 (D.C. 1961)).

Here, the Court first encounters an issue that will recur throughout this opinion: whether Mr. Benton knew, or should have known, that Mr. Bethel did not steal the air conditioner.  At the outset, the evidence is compelling that Mr. Benton believed that Mr. Bethel stole the air

---

[13] Mr. Benton did not direct that Mr. Bethel be arrested.  *See* Benton Dep. Tr. 109:13–109:15.

conditioner.  He watched Mr. Bethel in person and on a recorded video and concluded it was necessary to report a theft to Officer Rodriguez.  *See, e.g.*, Benton Dep. Tr. at 32:13–18, 98:3–13, 103:2–22.  Officer Rodriguez agreed with his conclusion.  *See, e.g.*, Rodriguez Dep. Tr. 105:14-106:1.  And when Mr. Benton later uncovered an additional video that showed Mr. Bethel paying for an air conditioner, he immediately contacted Officer Rodriguez to inform him of the video and say that there was no longer sufficient evidence of a theft.  *See* Benton Dep. Tr. at 54:2–15; 89:19–90:1.  It is undisputed that Mr. Benton and Mr. Bethel have no personal relationship with each other, and nothing in the record would suggest any type of animosity or any motivation for Mr. Benton to falsely accuse Mr. Bethel.  Indeed, Mr. Benton's behavior is largely inexplicable in any circumstance other than an initial genuine belief that Mr. Bethel stole the air conditioner, followed by a later realization that he was mistaken.

But one critical factual dispute prevents the Court from reaching a definitive conclusion.  Mr. Bethel contends that rather than leaving the store without going to a cashier, he returned to the same cashier that sold him the initial unit, and the cashier confirmed that Mr. Bethel was free to leave with the substituted and undamaged unit.  *See* Pl. Dep. Tr. at 30:20–31:7, 111:2–16, 112:17–113:11.  This narrative is fundamentally incompatible with Mr. Benton's testimony that he watched Mr. Bethel place an air conditioner into his cart and leave the store without stopping by any points of sale or speaking to a cashier.  *See* Benton Dep. Tr. at 29:7–19; 31:18–32:4, 59:18–60:2.  Either Mr. Bethel picked up an air conditioner and headed directly out of the store, or he returned to a cashier to confirm that he was merely swapping out a purchased product.  To take Mr. Bethel's testimony as true—and the Court must construe the evidence favorably against Mr. Bethel, as non-movant—would indicate that Mr. Benton was untruthful or recklessly incorrect about Mr. Bethel's actions in his report and his conversation with Officer Rodriguez.

Mistakes happen, but if Mr. Bethel stopped and spoke with a cashier, it would be far beyond an ordinary mistake for Mr. Benton to watch Mr. Bethel in real-time and on a video but still somehow tell Officer Rodriguez that Mr. Bethel picked up an air conditioner and quickly left the store without passing any registers.

It is material whether Mr. Bethel left the store immediately or stopped to speak with a cashier. In the first scenario, it would be plausible to assume Mr. Bethel stole the air conditioner. The second scenario, by contrast, would lead to other questions about what Mr. Bethel said to the cashier and why the cashier allowed him to proceed out of the store without making an objection. Moreover, while in the first situation there would be no cashier to speak with at all, the second situation naturally invites at least a brief inquiry with the cashier about what occurred. Although Mr. Benton testified that he does not speak to cashiers about possible theft, apparently pursuant to a Home Depot policy that addresses potential conflict of interest, the Court sees no reason to defer to that practice when assessing whether Mr. Benton acted in good faith. *See* Benton Dep. Tr. at 60:10–11, 112:19–113:10. Such an approach may well be desirable for Mr. Benton, and for the store, while simultaneously falling short of a good faith investigation in some cases. The Court recognizes that even if Mr. Benton did observe Mr. Bethel stop by a cashier, he could still possibly conclude that Mr. Bethel was engaged in theft. But making that determination would be much more complicated than if Mr. Bethel made a beeline for the exit; the two situations are substantially different and substituting one for another would conceal a material fact.

Before moving on, the Court expresses some skepticism about the strength of Mr. Bethel's position in the material dispute. It is difficult to understand why, if Mr. Benton either intentionally or recklessly made a false report of theft, he would later quickly act to reverse course after discovering a second video where Mr. Bethel paid for an air conditioner. This

course of conduct supports Mr. Benton's account of the events on July 19, 2019.  Yet the Court cannot now that resolve that factual dispute, and likewise, Mr. Benton cannot currently receive immunity for his report of a crime.

But for Mr. Benton to be potentially liable for false arrest, Mr. Bethel must have been restrained or detained at some point.  The only possibility for such detention is during Mr. Bethel's visit to the police station on August 21, 2019.   Mr. Bethel showed up at the police station alone and at a time of his choosing.  *See* Pl. Dep. Tr. at 118:19–119:3, 121:3–4, 126:16– 127:6.   After entering the station, Mr. Bethel spoke to a police officer who told him that he could not locate any warrant for his arrest.  *Id.* at 122:1–7, 124:6–11.  Mr. Bethel was not taken into the back of the station or placed in handcuffs.  *Id.* at 125:5–12, 128:11–13.  Although Mr. Bethel vaguely recalled that an officer told him his name would be placed in a detention journal, it apparently was not.  *See id.* at 61:9–14; Detention Journal.  Ultimately, after the officer searched for—and did not find—any warrant, he informed Mr. Bethel that he was free to leave, and Mr. Bethel did leave the station.  *Id.* at 128:14–18.  At his deposition, Mr. Bethel was asked if he was arrested at any point in the station, and he answered "no."  *Id.* at 128:8–10 ("Q: 'And, at any point, were you arrested inside of the station?'  A: 'No.'").

Still, Mr. Bethel came to the station because of Officer Rodriguez's decision to seek an arrest warrant, and when he went to the station, he was "very concerned" that he would be arrested there.  *Id.* at 120:18–121:2.  Mr. Bethel spent at least half an hour, and possibly up to an hour, at the station while an officer attempted to locate a warrant.  *Id.* at 126:16–127:6.  Until the officer informed Mr. Bethel that there was no warrant, he felt that he could not leave the

station of his own accord.[14]  *See id.* at 216:9–217:13.  And although Mr. Bethel stated in his deposition that he was not arrested at the station, his answer may well have relied on a colloquial interpretation of the word "arrest."  *See id.* at 128:8–13.  In the context of a false arrest claim, "[t]he concept of 'arrest' is substantially malleable, and '[c]onfinement, no matter how brief, suffices to establish a prima facie case of false arrest.'"  *Sherrod v. McHugh*, 334 F. Supp. 3d 219, 256 (D.D.C. 2018) (quoting *Marshall v. District of Columbia*, 391 A.2d 1374, 1381 (D.C. 1978)).

Indeed, prior cases indicate that Mr. Bethel very well may have been arrested—as the term is used in the context of a false arrest tort—at the police station.  The District of Columbia Court of Appeals has previously "found a viable false arrest claim after concluding the plaintiff did not voluntarily accompany officers to the police station, since they did not inform him that he could refuse without punishment."  *Dingle v. District of Columbia,* 571 F. Supp. 2d 87, 97 (D.D.C. 2008) (citing *Marshall,* 391 A.2d at 1381).  While Mr. Bethel technically acted of his own free will in going to the police station, a police officer had suggested he do so, and Mr. Bethel reasonably believed that there would be a warrant for his arrest when he arrived.  *See, e.g.*, Dist. Defs. SOMF ¶ 31.

Another case from the District of Columbia Court of Appeals, *Weishapl*, 771 A.2d 1014, also supports the idea that Mr. Bethel was arrested.  There, the court held that, in the absence of "force [or] a threat of force," when a plaintiff "voluntarily complie[s] with the officer's recommendation . . . [s]uch voluntary actions are not a restraint or arrest of the person."  771

---

[14] Mr. Bethel also may have been told that he would be placed in a holding cell, but he was unable to offer any detail about this statement.  *See* Pl. Dep. Tr. at 61:9–14.

A.2d at 1021.  To support this proposition, the court turned to *Bass v. Dunbar House, Inc.*, 161

A.2d 50 (D.C. 1960):

> In *Bass,* a night clerk at a hotel was questioned about missing funds from the hotel by management personnel and the police at the hotel.  The police then requested Bass to go to police headquarters, and Bass drove himself there, where he was questioned by the police.  At issue on appeal was whether a false arrest had occurred when the police requested Bass to go to police headquarters for questioning the day the financial loss was discovered.  This court held that he was not arrested in that he "was under no warrant or other form of compulsion when he went to police headquarters."

*Weishapl*, 771 A.2d at 1021 (quoting *Bass,* 161 A.2d at 51).

True, like in *Bass*, Mr. Bethel went to police station "willingly and without protest."  161

A.2d at 51.  But quite differently, to the best of Mr. Bethel's knowledge, he was under an arrest

warrant when he went to the police station.  That fact makes it difficult to describe Mr. Bethel's

visit to the police station as voluntary.  *See also Dingle*, 571 F. Supp. 2d at 97 (finding an

actionable claim of false arrest at summary judgment stage when plaintiff willingly accompanied

police officers to the back of a police station amid a threat of arrest if she did not).  Drawing

factual inferences in Mr. Bethel's favor, the Court finds it quite possible that Mr. Bethel was

arrested—as the term is used in the context of a false arrest tort—at the police station.  At the

very least, the issue remains open for trial, where Mr. Bethel would have the opportunity to

elaborate on the events that occurred at the police station.

In any event, the dispute over the events on July 19, 2019 means that the Court cannot

conclude at this stage that Mr. Benton is not liable for false arrest, and that it cannot grant

judgment for Mr. Benton on Count Six.  To do so would violate the Court's obligation to

"eschew" credibility determinations.  *Czekalski*, 475 F.3d at 363.

2.  Officer Rodriguez

Mr. Bethel's false arrest claims against Officer Rodriguez also will go forward.  With an open question as to whether Mr. Bethel was ever detained, the analysis turns to whether Officer Rodriguez had probable cause to arrest him.[15]  Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity."  *Wesby*, 583 U.S. at 57 (citation omitted).  "The issue of probable cause in a false arrest case is a mixed question of law and fact that the trial court should ordinarily leave to the jury."  *Bradshaw*, 43 A.3d at 324 (quoting *Enders*, 4 A.3d at 469).  However, "[a]n arrest pursuant to a valid warrant typically provides no basis for a false arrest claim because 'the fact that a neutral magistrate has issued a warrant is the clearest indication that the [arresting] officers acted in an objectively reasonable manner.'"  *Cruz-Roldan v. Nagurka*, 547 F. Supp. 3d 27, 43 (D.D.C. 2020) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012)); *see also United States v. Spencer*, 530 F.3d 1003, 1006–07 (D.C. Cir. 2008) ("[W]e give 'great deference' to the issuing judge's probable-cause determination." (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983))).

This ordinary deference falls away "when the affidavit upon which the magistrate relied 'contain[ed] a deliberately or recklessly false statement.'"  *Lane v. District of Columbia*, 211 F. Supp. 3d 150, 173 (D.D.C. 2016) (alteration in original) (quoting *Franks v. Delaware*, 438 U.S. 154, 165 (1978)).  The false statement must also be material, and "allegedly false information in an affidavit is material only if, when it is 'set to one side, the affidavit's remaining content is

---

[15] The Court observes again that Officer Rodriguez and Mr. Bethel never interacted directly.  Yet without the warrant obtained by Officer Rodriguez, Mr. Bethel would not have been at the police station on August 21, 2019.  Thus, in the present analysis, the Court views the probable cause for any detention at the police station as co-extensive with probable cause for the arrest warrant itself.

insufficient to establish probable cause.'" *United States v. Ali*, 870 F. Supp. 2d 10, 27 (D.D.C. 2012) (quoting *Franks*, 438 U.S. at 156).

Here, a judge issued an arrest warrant after seeing Officer Rodriguez's affidavit. *See* Rodriguez Compl. and Arrest Warrant. Normally, that judge's determination gives "the clearest indication" that Officer Rodriguez was reasonable in his belief that there was probable cause for arrest. *Cruz-Roldan*, 547 F. Supp. 3d at 43. Yet, the accuracy of the affidavit is at issue; the Court must again turn to the contested evidence about Mr. Bethel's activity at the Home Depot.

As with the evidence about Mr. Benton, the evidence also tends to support the conclusion that Officer Rodriguez's affidavit was either true, or at least not deliberately or recklessly false. Officer Rodriguez spoke to Mr. Benton and reviewed his incident report, and then also reviewed the video of Mr. Bethel in the store, which he testified corroborated Mr. Benton's account. *See* Rodriguez Dep. Tr. at 71:7–73:12; 104:16–106:1. Officer Rodriguez said that he therefore believed there was probable cause for an arrest, *see id.* at 105:17–106:1, and "[o]nce a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest," *Amobi*, 755 F.3d at 990 (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997)). And of course, Officer Rodriguez acted to withdraw the warrant when told about a second video that showed Mr. Bethel paying for an air conditioner. *See* Rodriguez Dep. Tr. at 98:2–19.

But also as with Mr. Benton, Officer Rodriguez's testimony is materially inconsistent with Mr. Bethel's testimony. If Officer Rodriguez reviewed the video of Mr. Bethel, as he said he did, *see, e.g.*, Rodriguez Dep. Tr. at 71:7–73:12, it is highly doubtful that he could make an honest error as to whether Mr. Bethel directly left the store or stopped to present the air conditioner to a cashier. Officer Rodriguez's testimony also relied on the fact that it would be

hard to discern whether Mr. Bethel purchased the air conditioner, testifying that it would have been difficult to identify a record of his purchase because Home Depot has over "30 registers in that store" and "you can never point to who bought what because [the receipts] have no names." *Id.* at 107:11–15.  That point would be inapposite if the video showed Mr. Bethel stopping at a register before leaving; speaking to the cashier would be a natural next step.

If Officer Rodriguez omitted from his affidavit that he watched a video contradicting Mr. Benton's account, and instead repeated Mr. Benton's narrative as told, that would be sufficiently material to vitiate reliance on the judge's arrest warrant for the purposes of a false arrest claim. And so this factual uncertainty sustains an issue of probable cause for trial.  *Amobi*, 755 F.3d at 990 ("Only where the facts are undisputed or clearly established does probable cause become a question of law for the court.").  The Court will allow the false arrest claims against Officer Rodriguez and the District (Counts One, Five, and Thirteen) to proceed.[16]

## B.  Mr. Bethel's Malicious Prosecution Claim Fails Because He Was Not Prosecuted

A Fourth Amendment claim for malicious prosecution, under 42 U.S.C. § 1983, allows for recovery of damages when a suit is instituted without any probable cause, the motive in instituting the suit was malicious, and the prosecution ends without a conviction.  *Thompson v. Clark*, 142 S. Ct. 1332, 1337–38, 1341 (2022).  While Mr. Bethel was informed that he was under police suspicion, no suit was ever initiated against him.  The warrant was withdrawn

---

[16] Officer Rodriguez does not invoke the doctrine of qualified immunity to defend himself against the § 1983 charge in Count One.  "Qualified immunity shields federal and state officials from money damages [under § 1983] unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011).  Officer Rodriguez instead bases his defense solely on the assertion that any arrest of Mr. Bethel was supported by probable cause.  *See, e.g.*, Dist. Defs. Mem. at 11.

before he was arrested and before any court proceedings occurred.  With an essential element of the claim absent in this case, Officer Rodriguez is entitled to summary judgment on Count Two.

### C.  Mr. Bethel Was Not Assaulted

An assault "is an intentional attempt or threat to do physical harm to another."  *Harris*, 776 F.3d at 913.  An assault "results from apprehension of an imminent harmful or offensive contact, in contrast with the contact itself."  *Pers. v. Children's Hosp. Nat. Med. Ctr.*, 562 A.2d 648, 650 (D.C. 1989).  Further, "if a defendant acts knowing with substantial certainty that his actions will cause a third party to create the apprehension of imminent harmful or offensive contact in another, he is liable for assault."  *Sherrod v. McHugh*, No. 16-cv-0816, 2017 WL 627377, at *5 (D.D.C. Feb. 15, 2017).

Mr. Bethel's assault claim against Officer Rodriguez cannot succeed because the record has no evidence that Mr. Bethel was ever threatened with imminent harm or offensive contact by Officer Rodriguez or anyone else.[17]  Mr. Bethel and Officer Rodriguez never met or communicated with each other.  *See* Rodriguez Dep. Tr. at 85:6–11.  There is no suggestion that Officer Rodriguez conveyed any type of threat through the warrant squad, that the warrant squad made any such threats, or that the warrant squad took any actions that would create an apprehension of imminent harmful contact.  *See* BWC Video at 6:12–6:20 (Officer Harmon telling Mr. Spann that Mr. Bethel's court matter was "nothing serious").  Mr. Bethel did not personally interact with the warrant squad in person and was informed of the encounter through his wife.  *See* Pl. Dep. Tr. at 17:9–22.  There is no indication that Mr. Bethel's phone call with

---

[17] In a previous opinion in this case, the Court denied Mr. Rodriguez's attempt to dismiss the assault claim because he failed to explain his argument for dismissal.  *See Bethel*, 2022 WL 971066, at *6.  Even then, the Court recognized Mr. Bethel's theory of assault as "certainly attenuated."  *Id.*

Officer Harmon involved any threats of imminent harm or offensive contact. *See id.* at 206:9–22.

Similarly, although Mr. Bethel was fearful that he would be arrested when he entered the police station, there are no identifiable events at the station that could create an apprehension of imminent harmful contact, and certainly not any such events traceable to Officer Rodriguez. In summary, there is no threatened use of force at all anywhere in the record. Because there are no material issues of fact through which Mr. Bethel could prove assault, the Court grants summary judgment for Officer Rodriguez on Count Eight.

### D.  Mr. Bethel's Negligence Claims Fail (Counts Nine and Fifteen)

Mr. Bethel has negligence claims against Officer Rodriguez and the District of Columbia. A plaintiff seeking damages under a negligence theory "must prove the applicable standard of care, a deviation from that standard of care by the defendant, and a causal relationship between that deviation and the plaintiff's injury." *District of Columbia v. Chinn*, 839 A.2d 701, 706 (D.C. 2003) (citation omitted and cleaned up). Expert testimony is required in negligence cases when "the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson.'" *Briggs v. Wash. Metro. Area Transit Auth.*, 481 F.3d 839, 845 (D.C. Cir. 2007) (quoting *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C. 2000)); *see also Hill v. Metro. African Methodist Episcopal Church*, 779 A.2d 906, 908 (D.C. 2001) (same).

Expert testimony is often required to resolve claims that the police have acted negligently. *See, e.g.*, *Smith v. District of Columbia, et al.*, 882 A.2d 778, 792–93 (D.C. 2005) (requiring expert testimony on claims of failure to train, supervise, and discipline police officers); *see Moore v. District of Columbia*, 79 F. Supp. 3d 121, 144–45 (D.D.C. 2015)

(collecting cases for the proposition that "expert testimony has been required for claims of negligent training of police personnel").  Indeed, the Court has previously recognized that expert testimony was likely required in this case.  In a previous opinion denying the District's motion to dismiss the negligence claim, the Court stated that, "[a]t this stage of the proceedings, before expert witnesses have been identified and expressed their opinions about the applicable standard of care, no more is required."  *Bethel,* 2021 WL 1340961, at *13 (quoting *Sherrod,* 2017 WL 627377, at *20).  Nevertheless, Mr. Bethel has not identified any experts pursuant to Fed. R. Civ. P. 26(a)(2)(B).  *See Minebea Co. v. Papst,* 231 F.R.D. 3, 5–6 (D.D.C. 2005) ("The purpose of [the] Rule . . . is to prevent unfair surprise at trial and to permit the opposing party to prepare rebuttal reports, to depose the expert in advance of trial, and to prepare for depositions and cross-examination at trial.").  Discovery has closed, and it is now too late for Mr. Bethel to rely on an expert.

Without an expert, Mr. Bethel will be unable to identify any appropriate standard of care for investigations relating to retail theft or show that Officer Rodriguez failed to comply with that standard.  Officer Rodriguez and the District point out that Mr. Bethel seemingly plans to rely on the MPD's General Orders to support his negligence claims.  *See* Dist. Defs. Mem. at 18 (citing Rodriguez Dep. Tr. at 29:4–16, 29:16–32:10, 32:11–35:9, 35:10–37:5).  The General Orders are insufficient for this purpose.  *See District of Columbia v. Walker*, 689 A. 2d 40, 47 n. 13 (D.C. 1996) (finding that jury can consider general order, but liability can only be found if the officers violated a standard of care); *Rice v. District of Columbia*, 715 F. Supp. 2d 127, 132 (D.D.C. 2010) ("While evidence that the police violated a general order can be a factor, for example, in a case asserting . . . negligence in conducting a police chase, liability only attaches if the police were negligent with regard to a national standard of care.").  An expert must instead

establish a standard of care by referring to "commonly used police procedures, identifying specific standards by which the jury could measure the defendant's actions." *Butera v. District of Columbia*, 235 F.3d 637, 659 (D.C. Cir. 2001); *see also Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 29 (D.D.C. 2011) (stating, in an excessive force case, that the District was entitled to summary judgment because plaintiff's expert did not rely on any "local or national policy or procedure to establish the standard of care" but rather relied only on MPD training material).

With no expert testimony here, Mr. Bethel can do no more than ask a jury to speculate about the appropriate standard of care that Officer Rodriguez should have followed in investigating the alleged theft. *See District of Columbia v. Davis*, 386 A.2d 1195, 1201 (D.C. 1978) (noting that juries cannot engage in idle speculation). The Court will grant summary judgment for Officer Rodriguez and the District on the negligence claims (Count Nine and Fifteen).[18]

### E.  Mr. Bethel's Defamation Claims Go Forward

In a defamation claim, the plaintiff must show

(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4)

---

[18] Although Officer Rodriguez and the District do not make this argument, Mr. Bethel's negligence claim may be so connected to his false arrest claim that it does not actually represent a separate and valid claim. In *Stewart-Veal v. District of Columbia*, 896 A.2d 232 (D.C. 2006), the court affirmed a trial court's dismissal of a negligence claim because "it [was] not separate and distinct from the false arrest claim; rather, it [was] intertwined with and dependent on that claim." *Id.* at 235. A more recent case upheld a grant of summary judgment against a plaintiff's negligence claim because his claims of "negligent arrest" and "false arrest" were "indistinguishable." *Katz v. District of Columbia*, 285 A.3d 1289, 1317 (D.C. 2022). In this case, Mr. Bethel focuses on the individual actions of Officer Rodriguez, arguing that he violated MPD policy because he did not have probable cause for an arrest warrant. *See* 2d Am. Compl. ¶¶ 106–11. As a result, his negligence claim touches upon highly similar issues to the false arrest claim and may not offer "independent grounds for finding negligence." *Katz,* 285 A.3d at 1317 (citation omitted).

either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.

*Rosen v. Am. Isr. Pub. Affs. Comm., Inc.*, 41 A. 3d 1250, 1256 (D.C. 2012).  "A defamatory statement is one 'that tends to injure the plaintiff in his [or her] trade, profession or community standing, or lower him [or her] in the estimation of the community."  *Kenley v. District of Columbia*, 83 F. Supp. 3d 20, 48–49 (D.D.C. 2015) (alteration in original) (quoting *Kendrick v. Fox Television*, 659 A.2d 814, 819 (D.C. 1995)).  "A false allegation of criminal wrongdoing is defamation *per se*, requiring no showing of special damages."[19]  *Westfahl v. District of Columbia*, 75 F. Supp. 3d 365, 375 (D.D.C. 2014).

Mr. Benton, Officer Rodriguez, and the District argue that they are protected from a defamation claim by qualified privilege, also known as common interest privilege.[20]

The common interest privilege protects otherwise defamatory statements made "(1) . . . in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty, (3) to a person who has such a corresponding interest."

*Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 624 (D.C. Cir. 2023) (quoting *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 858 (D.C. Cir. 2006)); *see also Moss v. Stockard*, 580 A.2d 1011, 1024 (D.C. 1990) (same, referring to both "common interest" privilege and "qualified privilege").  The common interest privilege "exists only if the publisher believes, with reasonable grounds, that [the] statement is true."  *Wright*, 68 F.4th at 624 (quoting *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan*, 374 A.2d 284, 290 (D.C. 1977)).  And specifically, the common interest privilege applies as a "qualified privilege to any person who

---

[19] The Court repeats that it is now clear that the accusation that Mr. Bethel stole the air conditioner was false.  *See, e.g.*, Rodriguez Dep. Tr. at 98:2–19.

[20] Mr. Bethel's defamation claim against the District appears to be rooted in a respondeat superior theory, *see infra* at 9 n.9, and so rises and falls with the claim against Officer Rodriguez.

reports a crime, as long as the 'statement about suspected wrongdoing is made in good faith to law enforcement authorities.'" *Hall v. District of Columbia*, 867 F.3d 138, 149 (D.C. Cir. 2017) (quoting *Carter v. Hahn*, 821 A.2d 890, 894 (D.C. 2003)).

Two circumstances will prevent a defendant from invoking the common interest privilege.  First, excessive publication, meaning "publication to those with no common interest in the information communicated, or publication not reasonably calculated to protect or further the interest." *Mastro*, 447 F.3d at 858 (quoting *Moss*, 580 A.2d at 1024).  Second, and more importantly in this case, publication with malice, which is "the equivalent of bad faith." *Id.* (quoting *Moss*, 580 A.2d at 1025).  Bad faith means the publication was made "without just cause or excuse, with such a conscious indifference or reckless disregard as to its results or effect upon the rights or feeling of others as to constitute ill will." *Moss,* 580 A.2d at 1025 (quoting *Mosrie v. Trussell*, 467 A.2d 475, 477 (D.C. 1983)); *see also Hall*, 867 F.3d at 149 (same, in the context of reporting a crime).   There is no malice if "the defendant has done no more than to fail to undertake a reasonable inquiry as to the truth of the assertion prior to publication—conduct amounting to ordinary negligence." *Moss*, 580 A.2d at 1025.

Finally, "[w]hether a statement is privileged is a question of law." *Payne v. Clark*, 25 A.3d 918, 925 (D.C. 2011).  "[T]he defendant bears the burden of proving the elements of the common interest privilege, the burden of defeating the privilege by showing excessive publication or publication with malice lies with the plaintiff." *Mastro*, 447 F.3d at 858*; see also Wright*, 68 F.4th at 624 ("[W]hile a defendant is 'presumed' to act with 'pure motives' in making a conditionally privileged statement, a plaintiff may 'rebut this presumption' through a showing of malice." (quoting *Ford Motor Credit Co. v. Holland*, 367 A.2d 1311, 1314 (D.C. 1977))). And "while the existence of the privilege is a question of law for the court, whether it was

abused by the defendant, is a question of fact by the jury." *Mosrie*, 467 A.2d at 477; *see also Oparaugo v. Watts*, 884 A.2d 63, 82 (D.C. 2005) ("Whether a person acts with malice is ordinarily a question of fact for the jury.").

### 1. Mr. Benton

As an asset protection employee for Home Depot, Mr. Benton had a common interest in reporting theft to Officer Rodriguez.  And regardless, anyone who reports a crime to law enforcement authorities in good faith falls within qualified privilege. *See Hall,* 867 F.3d at 149. Also, Mr. Benton did not engage in excessive publication; there is no record evidence that he made a statement about Mr. Bethel to anyone outside of Home Depot or law enforcement. However, the existence of qualified privilege does not end the analysis.

Rather, the Court returns to a familiar point about the disputed material facts.  While there is no discernible motive for why Mr. Benton would intentionally make a false accusation against Mr. Bethel—and his later activity in reporting the second video to Officer Rodriguez seems to rebut any such possibility—the record contains contradictory testimony from Mr. Benton and Mr. Bethel about the events on July 19, 2019.  To take Mr. Bethel's narrative as accurate would mean to find Mr. Benton's inaccurate, and vice versa.  And if Mr. Benton said that Mr. Bethel left the store without paying for the air conditioner, despite witnessing him go to a cashier, that statement very well may satisfy the malice standard.

This case is reminiscent of *Hall*, where a D.C. Circuit panel vacated a grant of summary judgment for the defendants on a defamation claim based on a false report of theft.  867 F.3d at 149, 160.  There, a restaurant employee called the police after a customer left the restaurant, claiming that the customer had failed to pay her bill. *Id.* at 147–48.  The record had conflicting evidence over whether the restaurant employee had already sought and received credit card

approval for the bill before she nonetheless called the police. *Id.* at 144, 147. The record also showed that the customer had left numerous personal items at the restaurant, including her credit card, driver's license, purse, and cell phone, indicating that she had not abandoned the bill at all. *Id.* at 148. The restaurant's conduct—reporting a customer for theft despite substantial evidence that she actually paid for her bill—was sufficient to preserve an issue of malice for trial. *Id.* at 149.

In this case, the record has conflicting evidence over whether Mr. Benton headed straight for an exit or stopped by the registers to talk to a cashier and confirm the unit swap. *Compare* Pl. Dep. Tr. at 30:20–31:7, 111:2–16, 112:17–113:11 *with* Benton Dep. Tr. at 29:7–19; 31:18–32:4, 59:18–60:2. Depending on determinations of credibility, a reasonable jury could believe either series of events. That jury could conclude that Mr. Bethel took an air conditioner and went to speak with a cashier, and that Mr. Benton failed to intercept Mr. Bethel to ask for a receipt and failed to follow up with the cashier about the encounter, and therefore also conclude that Mr. Benton lacked any reasonable basis to believe that Mr. Bethel stole the air conditioner. Consequently, there is a triable issue as to whether Mr. Benton acted with malice, and the Court cannot grant summary judgment on Count Nineteen. *Oparaugo*, 884 A.2d at 82 ("Whether a person acts with malice is ordinarily a question of fact for the jury.").

### 2. Officer Rodriguez

The Court takes a similar view of the claims against Officer Rodriguez (and the District). As an initial matter, Officer Rodriguez's statements were protected by the common interest privilege. When police officers make "alleged defamatory statements in good faith and pursuant to their official duties as police officers employed by the District of Columbia government . . . [t]he alleged statements are . . . qualifiedly privileged." *Winkey v. Campanale*, No. 08-cv-2171,

2013 WL 12407214, at *6 (D.D.C. May 30, 2013); *see also Jackson v. District of Columbi*a, 541 F. Supp. 2d 334, 344–45 (D.D.C. 2008) (police officer's good faith statements made pursuant to official duties deemed protected by the common interest privilege); *cf. Smith v. Dist. of Columbia*, 399 A.2d 213, 221 (D.C. 1979) (security guard's statements to police officer regarding suspected criminal wrongdoing made in the course of his duties deemed qualifiedly privileged). Officer Rodriguez's statements that Mr. Bethel committed theft were squarely in line with his duties as a police officer. Just like with Mr. Benton, there is no sign of excessive publication: Officer Rodriguez's statements were only communicated with other law enforcement persons, such as an AUSA, judge, and the warrant squad.[21]

But also just like Mr. Benton, Officer Rodriguez's statements do not match Mr. Bethel's testimony about July 19, 2019. Because there is a material issue about Mr. Bethel's conduct at Home Depot, there is a corresponding material issue about whether Officer Rodriguez could have viewed a video that corroborated Mr. Benton's report. *See* Rodriguez Dep. Tr. at 71:7–73:12. A reasonable jury could conclude that he did not, that he acted with malice in nevertheless accusing Mr. Benton of theft, and that the qualified privilege does not apply. Such a conclusion may not be especially likely—the Court once more reiterates Officer Rodriguez's efforts to withdraw the warrant after being informed of the second video—but resolving that

---

[21] As discussed previously in this opinion, the defamation claim against the District appears to be based on respondeat superior liability for the publications by Officer Rodriguez, and not publication by the warrant squad or anyone else associated with the District. Still, "[t]he original publisher of a defamatory statement may be liable for republication if the republication is reasonably foreseeable." *Oparaugo*, 884 A.2d at 82. Here, the only possible republication falling outside the chain of the justice system would be the warrant squad's statements to Mr. Bethel's father-in-law, Mr. Spann. Irrespective of whether such republication would be reasonably foreseeable, it never happened: the video evidence shows that the warrant squad did not tell Mr. Spann that Mr. Bethel was suspected of theft and therefore did not republish Officer Rodriguez's statements. *See generally* BWC Video.

factual dispute is not the purpose of summary judgment.  Consequently, the Court will deny

summary judgment for Officer Rodriguez on Count Eighteen, and for the District on Count

Twenty.

### 3.  Home Depot

Mr. Bethel's claim of defamation per se against Home Depot will also go forward.  As

discussed above, *see infra* at 10, Home Depot's motion to dismiss Count Twenty-One is

procedurally improper at this stage, but the Court sees no potential prejudice that would stem

from construing the request as a motion for summary judgment.  Mr. Bethel seeks to hold Home

Depot responsible for Mr. Benton's alleged defamation under a respondeat superior theory,

although this is not directly stated in Count Twenty-One itself.  *See* 2d Am. Compl. ¶ 15

("Defendant Nelson Benton . . . was acting within the scope of his employment when on July 19,

2019, and July 20, 2019, he falsely accused Plaintiff Bethel . . . ."); *see also id.* ¶¶ 186–90.

"[W]hether an employee was acting within the scope of employment is ordinarily a fact-

intensive question for the factfinder, and as such is not subject to determination as a matter of

law in resolving a motion to dismiss or a motion for summary judgment." *Trump v. Carroll*, 292

A.3d 220, 230 (D.C. 2023).  With the individual claim against Mr. Benton going forward, and no

occasion to presently resolve whether Mr. Benton's statements were within the scope of his

employment, the Court denies summary judgment for Home Depot on Count Twenty-One.

### F.  Punitive Damages is Not an Independent Cause of Action

Finally, Mr. Bethel brings a count for punitive damages against Mr. Benton and Officer

Rodriguez, but punitive damages are a "remedy and not a freestanding cause of action." *Gharib

v. Wolf*, 518 F. Supp. 2d 50, 56 (D.D.C. 2007).  It is "clear beyond cavil that the District of

Columbia only recognizes punitive damages as a *remedy* and not an independent cause of

action." *Kubicki on behalf of Kubicki v. Medtronic, Inc.,* 293 F. Supp. 3d 129, 193 (D.D.C. 2018) (emphasis in original).  Mr. Benton and Officer Rodriguez are entitled to summary judgment on Count 12 as an independent count, but punitive damages may still be possible as a form of relief.[22]

While Officer Rodriguez seemingly asks the Court to eliminate punitive damages as a remedy, it will not do so.  *See* Dist. Defs. Mem. at 23–24.  Under District of Columbia law, to recover punitive damages, "[a] showing of evil motive or actual malice is . . . required."  *Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 372 (D.C. 1993).  "Proof of these elements may be inferred from the acts of the defendant and from circumstantial evidence."  *Rogers v. Ingersoll–Rand Company*, 971 F. Supp. 4, 12 (D.D.C. 1997).  "The issue is ordinarily one for the trier of fact."  *Id.*  Given that the Court has already identified that this case involves factual issues of malice, it declines to foreclose the availability of punitive damages.

## V.  CONCLUSION

For the foregoing reasons, Defendants Home Depot and Nelson Benton's Motion for Summary Judgment and Motion to Dismiss, ECF No. 60, and Defendants Jose Rodriguez and the District of Columbia's Motion for Summary Judgment, ECF No. 62, are **GRANTED IN PART and DENIED IN PART**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  September 30, 2023                         RUDOLPH CONTRERAS
                                                   United States District Judge

---

[22] Just like Home Depot's improper attempt to dismiss Count Twenty-One, Mr. Benton moved to dismiss Count Twelve.  *See* Home Depot & Benton Mem. at 22.  Considering the crystal-clear case law on punitive damages, the Court is not concerned about converting this motion into a motion for summary judgment.